IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD D. PARKELL, :
:
    Plaintiff, :
:
v. : Civ. No. 14-601-LPS
:
ROBERT COUPE, et al., :
:
    Defendants. :

Donald D. Parkell, James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

Ophelia Michelle Waters, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

March 19, 2018
Wilmington, Delaware

STARK, U.S. District Judge:

## I. INTRODUCTION

Plaintiff Donald D. Parkell ("Plaintiff"), an inmate at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, proceeds *pro se* and has been granted *in forma pauperis* status. He filed this civil rights complaint pursuant to 42 U.S.C. § 1983 claiming violations of his constitutional rights. (D.I. 3) The amended complaint is the operative pleading. (D.I. 19) Presently before the Court is the motion for summary judgment of Defendants Robert Coupe ("Coupe") and Phillip Morgan ("Morgan") (together "Defendants") and Plaintiff's opposition thereto. (D.I. 63, 64, 66, 67)

## II. BACKGROUND

The original complaint was screened and dismissed with prejudice on the grounds that some of Plaintiff's claims duplicated those the Court had already dismissed in another of Plaintiff's suits, and the remainder were frivolous. (*See* D.I. 3, 10, 11) Plaintiff appealed. (D.I. 12) Upon appeal, the Third Circuit vacated dismissal of Plaintiff's failure to protect and denial of medical care claims against Coupe and Morgan, and remanded the matter to give Plaintiff an opportunity to amend those claims. *See Parkell v. Markell*, 622 F. App'x 136, 140-43 (3d Cir. July 27, 2015). Plaintiff filed an Amended Complaint on September 21, 2015. (D.I. 19)

**The Amended Complaint**. The case proceeds on two claims: failure to protect and denial of medical care. Plaintiff was incarcerated at the Howard R. Young Correctional Institution ("HRYCI") in Wilmington, Delaware and housed in its west-side from March 29, 2012 through January 31, 2014. Plaintiff alleges the west-side: (1) was overcrowded; (2) housed three inmates to a cell designed for one; (3) did not provide inmates adequate amenities, as they received fewer servings of food and razors than other prisoners; (4) did not have adequate telephones and shower stalls for the number of prisoners housed there; (5) required inmates to place their laundry in a single,

1

communal laundry tub, which led to theft; and (6) limited exercise to a small, indoor concrete enclosure that 59 inmates housed on the west-side must share. Plaintiff alleges that the HRYCI's most violent and transgressive inmates are assigned to the west-side housing area. In addition, he alleges that pretrial detainees and nonviolent offenders are housed together regardless of status and without a risk assessment. Plaintiff alleges the conditions at the HRYCI resulted in him being assaulted on October 13, 2013, and that Defendants knew the conditions posed a risk of harm yet failed to protect him. (*Id.* at ¶¶ 23, 36, 38, 44, 83, 85, 86, 89-96)

Following the assault, Plaintiff was taken to Christiana Hospital for treatment. While hospitalized, Plaintiff was held in four-point restraints. (*Id.* at ¶ 72) He alleges that his physician at Christiana Hospital prescribed him oxycodone but, when returned to HRYCI, medical personnel did not consider the medication ordered. (*Id.* at ¶¶ 64, 65, 67-69) Instead, Plaintiff was given Tylenol with codeine. (*Id.* at ¶ 65) Plaintiff alleges that he was doubled over in pain during his entire stay at the HYRCI infirmary. (*Id.* at ¶ 69) Plaintiff alleges that HYRCI has a practice that requires the medical vendor to replace all orders of narcotics with non-narcotics for no medical rationale. (*Id.* at 66) He also alleges that he was prescribed Elavil to treat his pain, but it is a medication used to treat mental illness. (*Id.* at ¶ 75)

**Evidence of Record.** According to Plaintiff's affidavit/declaration, the totality of the conditions on the west-side of HYRCI result in a "brutal gladiator type atmosphere [and] encourage[] gangs to develop in order for men to use desired amenities or to even eat sometimes. Any opposition to gang control to full unit dominance incurred an attack or intimidation." (D.I. 66 at 24-25)

Defendants admit that: (1) all 59 men on tiers built for 20 men did not have to have tier access at the same time and an easy alternative is to split the tier recreation in half, with only ten out

of the twenty cells unlocked at a time; (2) laundry bags were not issued to inmates and laundry was required to be placed in a large bin left on the tier all day, accessible to every man on the tier; (3) intake provided one pair of socks, two boxer shorts, two t-shirts, two uniforms, two sheets, one blanket, one washcloth, and one towel to new inmates; (4) sentenced inmates housed in the east-side of the institution and who commit class one infractions are required to live on the west-side for at least six months, in addition to any other punishments imposed by the hearing officer; (5) inmates on west-side tiers were forced to remain locked in their cells if there were staff shortages; (6) as a general practice, all inmates are locked in during code red times, however, some workers were not locked in, and it was documented on the count sheets; (7) inmates on the west-side are given the option to go to the yard with cement walls and floor, an area too small to hold 59 men, basketball is the only exercise available, and if an inmate did not wish to go to the concrete yard he was required to lock into his cell; and (8) two showers available for 59 men is not sufficient. (D.I. 55 at 2-5)

Defendants deny that: (1) phones were controlled completely by the inmates on each west-side tier, and that this arrangement caused many fights and assaults; (2) there was no risk assessment or compatibility considerations in place to determine housing assignments in units or individual cells; (3) 59 men on recreation at one time in tiers designed for 20 cause extremely high volume levels, create problems with sight lines for a tier officer, and cause men to often fight; (4) inmates were locked in their cells for some religious services until the service was either complete, or not let out of their cells until the following day; and (5) major disturbances occurred over telephones, televisions, and food services. (*Id.* at 2-6)

Defendants state: (1) on occasion there were food shortages and substitutions were made if HRYCI ran out of food; (2) there were enough razors for anyone who wanted to shave and razors are given to inmates who ask for them; (3) cell assignment for prisoners on the east-side is

designated by classification, not solely on availability of bed space; and (4) inmates are not locked in for all codes, but are locked in for some codes. (*Id.* at 2-5)

Plaintiff states that "fights, assaults, small riots, fires, suicide attempts, and more occurred daily. Codes were called over loudspeakers constantly." (D.I. 66 at 21) Plaintiff submitted numerous grievances complaining about the conditions at HRYCI. (D.I. 56-1 at 1-10, 44-47, 52-77, 83-86, 104-16, 119-34, 140-79, 209-13, 238-43) One grievance, dated September 17, 2012, refers to Plaintiff's housing on the same tier as sentenced inmates; he complained this subjected him to "the unpredictable behaviors of act-out prone sentenced inmates" who were cramped in the unit with him. (D.I. 56-1 at 116)

On October 13, 2013, C/O Kobus ("Kobus") saw another inmate and Plaintiff fighting by a sink during the chow clean up. (D.I. 64 at Ex. A) Kobus called a code 8 over the radio, and members of the security team responded to escort inmates off the pod. (*Id.*) Plaintiff was charged with fighting, and stated that "it wasn't a fight, the three of them jumped me. It was something deep rooted. I always took up for the little guy." (*Id.*) A disciplinary hearing was held on October 25, 2013, Plaintiff was found not guilty, and the inmates who attacked him were sent to the "hole." (D.I. 64 at Ex. A; D.I. 66 at 24)

Following the assault, Plaintiff was treated at the HRYCI infirmary for a laceration to his scalp and rib pain, and his eyes were flushed with eyewash. (D.I. 64 at Ex. B) He was transferred to Christiana Hospital for treatment of his injuries.[1] (D.I. 34 at 350, 364; D.I. 64 at Ex. B) Plaintiff was held in four-point restraints during his hospitalization. (D.I. 55 at 2) Plaintiff submitted a grievance complaining that while hospitalized for four days, with severe trauma to his ribs and lungs, multiple broken ribs, and a chest tube, he was held in four-point restraints, which were "painful."

---

[1] The record does not contain Plaintiff's medical records from Christiana Hospital.

4

(D.I. 56-1 at 223-31) Plaintiff acknowledged "security risks in every inmate action." (*Id.* at 231) An investigation determined that Plaintiff's hospitalization and treatment were "on par with Department Policies and Procedures" and that Plaintiff "was not mistreated by hospital or security staff. (*Id.* at 224, 229)

Plaintiff returned to HYRCI the evening of October 18, 2013, and was admitted to its infirmary, where he remained until October 23, 2017. (D.I. 34 at 346-365) The physician at Christiana Hospital had "prescribed a significant medication for pain at appropriate dose and levels" and when Plaintiff was released to return to the HYRCI the physician "prescribed a further regimen for recovery." (D.I. 66 at 25-26) Upon admittance to the HRYCI infirmary, Plaintiff was angry that HRYCI's medical contract provider was at the hospital and "limiting his care for profit." (D.I. 34 at 361) Plaintiff was advised by a Correct Care Solutions ("CCS") physician that Plaintiff was provided "standard of care" and CCS was addressing Plaintiff's pain. (*Id.*) While recovering in the infirmary, Plaintiff was given Tylenol #3 and Motrin. (*Id.* at 361, 364) Upon his discharge he was to continue taking the Tylenol #3, and he was also prescribed naproxen and Elavil for neuropathic pain. (*Id.* at 357)

On October 23, 2013, Plaintiff submitted a grievance about the medication administered him. (D.I. 56-1 at 231-37) He complained that in the hospital he was given a dilaudid drip and oxycodone and the "amount was perfect," while the pain management protocol used at HYRCI left him in intense pain. (*Id.* at 236) The sick call and pain management process was explained to Plaintiff. (*Id.* at 277) Investigation of the grievance determined that Plaintiff was on three medications that were considered medically adequate for his discomfort. (*Id.* at 232)

On October 24, 2013, Plaintiff refused the Elavil because he believes the medication is for "antipsychosis." (*Id.* at 563) According to Plaintiff, the medication prescribed was "so ineffective that [he] lived in a brutal hell for over two weeks." (D.I. 66 at 26) Defendants admit that Plaintiff

5

was prescribed a pain medication by the Christiana Hospital that was not provided to him at HYRCI. (D.I. 55 at 6)

According to Dr. Vincent Carr ("Dr. Carr"), medical director of the Bureau of Correctional Health Services ("BCHS") for the Delaware Department of Correction ("DOC"), the substitution of oxycodone with Tylenol with codeine is not inferior medication but is, instead, a proper analgesic for the situation. (D.I. 64 at Ex. C) After his discharge from the HRYCI infirmary, Plaintiff was prescribed Elavil for pain. (*Id.*) This medication is effective in treating neuropathic pain and has been considered a standard treatment for neuropathic pain for decades. (*Id.*) According to Dr. Carr, there is no BCHS or HRYCI policy that prohibits prescribing narcotics or controlled substances or requires replacing narcotics with non-narcotic prescriptions. (*Id.*)

Defendants move for summary judgment on the grounds that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.

## III. LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be -- or, alternatively, is -- genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its

burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

7

## IV. DISCUSSION

### A. Failure to Protect

The Amended Complaint raises several claims relating to conditions of confinement. As Defendants correctly note, those claims were dismissed under the standard for pretrial detainees and the dismissal was affirmed on appeal. *See Parkell*, 622 F. App'x at 139. On appeal, Plaintiff clarified he was a convicted inmate during the relevant time-frame and that he was not asserting conditions of confinement claims. *Id.* at n.3. Plaintiff refers to the conditions as a means to describe the environment in which he was imprisoned. Regardless, the Court will dismiss any conditions of confinement claims to the extent it was Plaintiff's intent to reassert them.

Plaintiff was assaulted by other inmates in October 2013. He alleges that the conditions under which he was housed on the west-side created a substantial risk that an inmate might be seriously harmed, that Defendants failed to protect him from that risk, and he was injured. Defendants move for summary judgment on the failure to protect issue on the grounds that there is no evidence to support the claims raised against them. Plaintiff responds that his claim arises from the direct result of intentional acts that were taken by Defendants to create an environment on the west-side of the HRYCI meant to directly punish the most transgressive sentenced prisoners.

The Eighth Amendment requires prison officials "to protect prisoners from violence at the hands of other prisoners," but not every prisoner-inflicted injury amounts to a constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994). To prevail on a failure-to-protect claim, there must be a showing that the prisoner was "(1) incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Farmer*, 511 U.S. at 834). An official acts with deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate

8

health or safety. *See Farmer*, 511 U.S. at 837. It does not matter "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843.

There is no evidence of record that Plaintiff complained to either Defendant about the alleged dangerous conditions at the HRYCI. Nor is there evidence that either Defendant was aware that the alleged conditions posed an excessive risk of attack for all prisoners in Plaintiff's situation. At most, the evidence reflects that Plaintiff complained on September 17, 2012 about being housed on the same tier as sentenced inmates and this subjected him to "the unpredictable behaviors of act-out prone sentenced inmates" who were cramped in the unit with him. (D.I. 56-1 at 116) The grievance was deemed non-grievable and there is no evidence that it was ever brought to the attention of either Defendant. In addition, it was submitted on September 17, 2012, more than a year before Plaintiff was assaulted in October 2013. Given the evidence of record, no reasonable jury could find that either Defendant had knowledge of a substantial danger to Plaintiff.

In addition, both Defendants are supervisory officials. To establish that either supervisory Defendant was deliberately indifferent, Plaintiff must identify a specific policy or practice that the supervising official failed to employ and show that the existing policy or procedure created an unreasonable risk of a constitutional violation, that the official was aware of but indifferent to the risk, and that the policy or procedure caused constitutional injury. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001). The elements are met where the supervisor "failed to respond appropriately in the face of an awareness of a pattern of such injuries" or where "the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support" a finding of deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

Plaintiff has identified no such policy, procedure, or practice. The Court considered Defendants' denials and admissions in determining whether there were policies, procedures, or practices that caused a risk of harm so great that the failure of Defendants to respond to the conditions would support a finding of deliberate indifference. While Defendants acknowledge overcrowding conditions and that inmates are housed in the west-side as a form of punishment, none of the admissions or denials point to a "brutal" prison atmosphere or that the atmosphere led to a pattern of inmate assaults. Defendants deny that phones were controlled completely by the inmates on each west-side tier, and that this arrangement caused many fights and assaults. They deny there was no risk assessment or compatibility considerations in place to determine housing assignments in units or individual cells. They deny that 59 men on recreation at one time in tiers designed for 20 cause extremely high volume levels, create problems with sight lines for a tier officer, and cause men to get into fights often. They deny that major disturbances have occurred over the phones and televisions and food services. Also, they indicate that cell assignment for prisoners on the east-side is determined by classification, not solely based on availability of bed space.

Plaintiff's affidavit refers, generally, to fights and assaults that occurred daily. However, as discussed by the Third Circuit, Plaintiff provides no evidence of a policy or practice to indicate how frequently fights over provisions occurred prior to his October 2013 assault, how many fights resulted in serious injury, and/or what prison guards' actual response – beyond sounding an emergency alert – was to such fighting. *See Parkell*, 622 F. App'x at 140. Nor is there evidence of record that the type of dispute that caused Plaintiff's injuries was so pervasive, injurious, and predictable, and guards' typical responses so ineffectual, that Defendants must have been aware of a problem merely by virtue of their institutional roles. The evidence does not support a finding of

unconstitutional conduct by Defendants. Therefore, the Court will grant the motion for summary judgment on the failure to protect claim.

### B. Medical Needs

Plaintiff alleges HRYCI has a policy that prevents medical personnel from providing medication or replacing it with an alternative medication of comparable strength. Defendants move for summary judgment on the grounds that there is no evidence to support Plaintiff's claims regarding the medication administered him.

Denial of medical care violates the Eighth Amendment if a prison official is deliberately indifferent to a prisoner's serious medical need. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference can occur when a prison official "knows of a prisoner's need for medical treatment but intentionally refuses to provide it" or "prevents a prisoner from receiving needed or recommended medical treatment." *Id.* Neither "mere allegations of malpractice" nor a prisoner's disagreement with prison medical professionals as to the proper method of treatment rises to the level of an Eighth Amendment violation. *See Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (citations omitted). As noted by the Third Circuit, assuming oxycodone was, in fact, necessary, HRYCI may have provided Plaintiff with qualitatively inferior and inadequate medical care. *See Parkell*, 622 F. App'x at 141 (citing *Rouse*, 182 F.3d at 197; *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978) (holding that an unconstitutional denial of medical care occurred where deliberate indifference by prison officials "caused an easier and less efficacious treatment to be provided")).

There is no evidence of record that HRYCI had a policy of substituting medication without a medical rationale. Instead, the DOC has a policy that provides for medical autonomy in providing medical care to inmates. (*See* D.I. 64 at Ex. E) "It is the policy of the DOC that the institution Medical Director designated by the Medical Contract Provider, has responsibility for approving

11

medical decisions made by supervised state licensed provider staff regarding the care provided to offenders of an institution. (*Id.* at ¶ E.1.)

Defendants admit that Plaintiff was prescribed a pain medication by the Christiana Hospital that was not provided by HYRCI. Plaintiff was told by a CCS physician that he was provided "standard of care," that CCS was addressing Plaintiff's pain, and that any non-formulary would need to follow a process. The unrefuted medical opinion of Dr. Carr is that substituting Tylenol with codeine for oxycodone did not leave Plaintiff with an inferior medication but, instead, in the prescriber's opinion, with the proper analgesic for the situation. The medical decision to substitute the medication was not made by either Defendant. It was made by medical personnel.

Given the medical records, and the opinion that the substitution was appropriate, no reasonable jury could conclude there was deliberate indifference to Plaintiff's medical needs. There is no evidence that Defendants had any involvement with regard to the administration of medication to Plaintiff. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."). Instead, as provided for in DOC policy, medical personnel were responsible for medical decisions made in providing care to Plaintiff. Accordingly, the Court will grant Defendants' motion for summary judgment on Plaintiff's medical needs claim.

Finally, Plaintiff alleges that his constitutional rights were violated when he was placed in four-point restraints during his hospitalization. Defendants did not address the issue in their motion for summary judgment. Parkell claims Defendants waived the issue by failing to raise it. However it is unclear to the Court if the failure to raise the issue was due to Defendants' reliance upon *Parkell v. Markell*, which did not address the issue of four-point restraints and determined that Plaintiff should

be allowed to amend the previously-dismissed conditions of confinement and medical needs claim, or if the failure to raise the issue was due to Defendants' oversight. Because of the foregoing, the Court does not agree that Defendants waived the issue.

The issue has not been fully fleshed out, and it is unclear if the four-point restraints were necessary due to security concerns, due to medical concerns, or both. Therefore, Defendants will be given leave to file a renewed motion for summary judgment that addresses this discrete issue.

## V. CONCLUSION

For the above reasons, the Court will grant Defendants' motion for summary judgment.[2] (D.I. 63) In addition, Court will enter an amended scheduling order.

An appropriate Order will be entered.

---

[2] Because summary judgment is appropriate on other grounds, the Court will not address the issue of qualified immunity.